399 So.2d 1346 (1981)
Cary M. COWAN and Donald L. Fader
v.
STATE of Mississippi.
No. 52524.
Supreme Court of Mississippi.
May 27, 1981.
Rehearing Denied July 8, 1981.
*1347 Donald J. Steighner, Colom & Mitchell, Columbus, for appellants.
Bill Allain, Atty. Gen. by Frankie Walton White, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROBERTSON, P.J., and SUGG and HAWKINS, JJ.
ROBERTSON, Presiding Justice, for the Court:
Paul Carey, Cary Cowan and Don Fader were jointly indicted in the Circuit Court of Lowndes County for manslaughter in the killing of Partee DePriest, "a human being, by culpable negligence, without authority of law by the negligent operation of an automobile." After a full trial, the jury returned verdicts of guilty as charged against Cary Cowan and Don Fader and a verdict of "not guilty" for Paul Carey. Cowan and Fader were each sentenced to 8 years confinement with the Mississippi Department of Corrections.
On September 29, 1979, around 6:15 p.m., Don DePriest, his wife, Pattie, and their 11-year-old son, Partee, were traveling in a westerly direction on Bluecutt Road. DePriest was driving, his wife Pattie was sitting on the front seat on the passenger side, and Partee was on the back seat. DePriest stopped at the intersection of Bluecutt Road and Highway 45. He waited about three minutes for traffic to clear, looked right and left and, seeing no traffic, proceeded into the intersection and began to make a left turn on Highway 45. DePriest noticed out of the corner of his eye "a wall of cars" coming north on highway 45 "at an exceptionally high rate of speed." His Honda automobile was first struck by the car driven by Cowan around the windshield post on the left side. The car driven by Fader apparently hit the DePriest car a glancing blow as Fader attempted to go around the DePriest car on the left. The right front and rear fenders of Fader's car were damaged. Fader kept going and never stopped. Carey, who apparently was racing the other two earlier but whose car did not hit the DePriest car, stopped and called an ambulance and the sheriff. When Fader was arrested the next day, his car had been repainted a different color.
Partee DePriest was badly injured; he had a massive skull fracture. He was transported by ambulance to the intensive care unit at Golden Triangle Medical Center where he remained for three days. During this period Dr. Wilson operated, removing a bone and elevating a depression on the left side of Partee's skull. Partee's brain stem began to swell and this affected his respiration. He went into respiratory arrest and had to be placed on a respirator. On October 3, Partee was transported to Ochsner Foundation Hospital in New Orleans. He never regained consciousness. Dr. Richard A. Coulon, Jr., a pediatric neurosurgeon, who treated Partee, on October 22, 1979, advised the family that Partee's "brain had ceased to function as an organ and it was our opinion that it had ceased to function and this was irreversible." Dr. Coulon advised the family that Partee was legally dead and that he would recommend taking him off of the respirator. The family agreed. Partee's heart stopped within 20 minutes after the respirator was removed. Dr. Coulon testified that if Partee had been kept on the respirator his heart probably would have kept pumping for between "fifteen to thirty days at the most, perhaps even less than that."
Appellants have assigned as error:
*1348 I. It was error for the trial court to permit a conviction of manslaughter where the attending physician in Louisiana disregards the Louisiana statute defining death and removes the ventilation from the injured patient causing the child's spontaneously functioning heart to cease beating which results in his death.
II. It is error in Mississippi for a trial court to permit an undefined medically disputed term "brain death" to be equated with death of a person with no Mississippi statute of facts of the case on which to base the determination as to what criteria are to be used in equating brain death or death of the person if any, and who and under what circumstances such a determination can or cannot be made.
III. The trial court erred in excluding the testimony of witness Hubert Chandler as to the timing of vehicles traveling through the intersection of the fatal collision.
IV. The trial court erred in granting the instructions of the state, over the objections of the defendants, which defined culpable negligence without any statement that the wilful and wanton conduct must have been the proximate cause of the collision resulting in the death of the deceased.
V. The trial court erred in overruling appellants' demurrer to the indictment on the ground that an indictment which does not contain such a description of the offense, as to notify the accused of the nature and cause of the accusation against him, is fatally defective. An indictment which charges a defendant with unlawfully, wilfully and feloniously killing a human being by culpable operation of an automobile is ambiguous, vague and uncertain and is, therefore, fatally defective for failure to inform the defendant of the nature and cause of the accusation against him.
VI. An indictment which charges an offense in the words of a statute which generally defines an offense, is insufficient where it alleges the offense in the language of the statute, but does not state the specific acts on which the charge is based, and is not sufficiently definite to be of any value as a bar to further prosecution.

I. and II.
Dr. Coulon's testimony was undisputed and uncontradicted that he followed Louisiana law in declaring Partee DePriest dead before the respirator was removed. He also testified that Ochsner Foundation Hospital used a combination of all three medically approved methods of determining whether a person is legally dead. Louisiana law provides in part:
"In the event that artificial means of support preclude a determination that these functions have ceased, a person will be considered dead if in the announced opinion of a physician, duly licensed in the state of Louisiana based upon ordinary standards of approved medical practice, the person has experienced an irreversible total cessation of brain function."
Mississippi did not have such a statute when appellants were tried on May 21 and 22, 1980, but on March 24, 1981, the following act became law:
AN ACT TO ADOPT THE UNIFORM DETERMINATION OF DEATH ACT.
BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF MISSISSIPPI:

SECTION 1. This act may be cited as the Uniform Determination of Death Act.

SECTION 2. An individual who has sustained either (a) irreversible cessation of circulatory and respiratory functions or (b) irreversible cessation of all functions of the entire brain, including the brain stem, is dead. A determination of death must be made in accordance with accepted medical standards.

SECTION 3. This act shall take effect and be in force from and after its passage.
In Thompson v. State, 220 Miss. 200, 70 So.2d 341 (1954), which involved a conflict of medical opinion as to whether the decedent's death was caused by a stab wound and subsequent hemorrhage therefrom or other causes, this Court held that it was within the province of the jury to determine the cause of death. The evidence was *1349 positive and undisputed that the cause of Partee's death was the massive head injury sustained in the automobile accident. The jury was amply justified from the evidence in finding that Partee's death was proximately caused by the culpable negligence of Cowan and Fader in racing through an intersection at speeds variously estimated by eyewitnesses from 70 to 100 miles per hour.
This Court said, in Schroer v. State, 250 Miss. 84, 160 So.2d 681 (1964):
"The unlawful act or omission of accused need not be the sole cause of death. The test of responsibility is whether the act of accused contributed to the death, and, if it did, he is not relieved of responsibility by the fact that other causes also contributed. Moreover, responsibility also attaches where the injury materially accelerates the death, although the death is proximately occasioned by a preexisting cause." 250 Miss. at 91, 160 So.2d at 684.
In State v. Johnson, 60 Ohio App.2d 45, 395 N.E.2d 368 (1977), a somewhat similar case, the Ohio Appeals Court said in pertinent part:
"As elaborated hereafter, the evidence was overwhelming that the blows Baum received from appellant were the cause of his death. What Dr. Walus did was to cease administering extraordinary measures to preserve life. His act could not conceivably be deemed the sole proximate cause of Baum's death. It would have to have been such for the court to find it an independent intervening cause as a matter of law.
... .
"Both witnesses who testified as medical experts for the state agreed on the cause of death. Dr. Walus stated that Baum died from `massive head trauma.' Dr. Robert Ritterhoff, the deputy coroner of Hamilton County and the individual who performed the autopsy on Baum, testified that the cause of death was `skull fracture * * * caused by external force.' At the time of the autopsy, which was conducted less than three hours after Baum's death, Dr. Ritterhoff `* * * saw a dead brain that had been dead for some days.' His conclusion, brought out on cross-examination, was that the discontinuance of supplemental oxygen to Baum was not a cause of death. Dr. Ritterhoff's unequivocal and uncontradicted testimony was sufficient to establish the necessary causal connection between appellant's criminal act and Baum's death... .
"... One who has inflicted an injury upon another is criminally responsible for his death, despite the fact that different or more skillful medical treatment might have saved his life, or that death was immediately caused by a surgical operation rendered necessary by the condition of the injury. .. .
"The weight and sufficiency of expert and opinion testimony is a matter for the jury. In homicide cases involving the effect of expert medical testimony as to the cause of death, the general principle is that the injury need not be proved to be the direct or sole cause of death, as long as it started a chain of causation which resulted in or substantially contributed to the death.
"To sum up, we conclude that no act of Dr. Walus either in operating or in stopping the supplemental oxygen supply was, as a matter of law, an independent intervening cause so as to require the granting of appellant's motion to acquit. We further conclude that there was ample evidence of probative value to support the jury's conclusion that the acts of appellant were the proximate cause of Baum's death. .. ."
60 Ohio App.2d 45, 395 N.E.2d at 373-74.
The evidence establishing causal connection between appellants' acts of culpable negligence and Partee DePriest's death was overwhelming, and the jury was justified in so finding.
There is no merit in the first and second assignments of error.

III.
Although the appellants failed to cite a single authority in support of their *1350 third assignment of error, that the trial court erred in excluding the testimony of Hubert Chandler as to the timing of the vehicles traveling through the intersection at the time of the fatal collision, and although under Ramseur v. State, 368 So.2d 842 (Miss. 1979), this Court is under no duty to consider this assignment of error, we have, nevertheless, given it some thought.
Chandler was not an eyewitness. He was later employed by the appellants to investigate the accident. He was allowed to testify as to distances and a diagram and chart prepared by him was admitted into evidence. He was not allowed to give his opinion or conclusion as to how long it would take to make a left turn from a dead stop and thus clear the intersection.
In Gandy v. State, 355 So.2d 1096 (Miss. 1978), this Court held that an investigator may only testify to the position of the vehicles, marks on the highway, position of debris, glass and dirt where he saw them. It is for the jury to determine from the physical facts the point of impact and how the collision occurred. The officer is prohibited from expressing his opinion as to the position of the vehicle at the time of the collision, nor is he permitted to express an opinion as to the point of impact. See also Gandy v. State, 373 So.2d 1042 (Miss. 1979). Lynch v. Suthoff, 220 So.2d 593 (Miss. 1969), a civil case, involved testimony by a police officer as to the point of impact and the drawing and outlining on a map of the automobile showing its assumed direction. This Court found this testimony to be inadmissible. In Jones v. Welford, 215 So.2d 240 (Miss. 1968), this Court stated:
"Considering these points chronologically, we discuss first the assignment with reference to the officer's testimony as to `point of impact.' The investigating officer cannot, of course, assume the duty of the jury and decide the issue as to how an accident occurred; nor can he give his opinion as to where a collision took place, based upon his observation as to the accident, nor give his opinion from what others told him. Standard Oil Co. v. Crane, 199 Miss. 69, 23 So.2d 297 (1945); Schumpert v. Watson, 241 Miss. 199, 129 So.2d 627 (1961)."
215 So.2d at 242.
From the foregoing authorities, it is clear that Chandler could not express an opinion as to the point of impact or how the accident occurred. Such testimony would have invaded the province of the jury and usurped its function.
The trial court was correct in excluding the opinion testimony of Hubert Chandler as to how the accident could not have happened based on his analysis of other witnesses' testimony.

IV.
Although appellants shoot with a scatterbarrel gun under this assignment of error and do not draw a bead on any particular instruction, the gist of their argument seems to be that nowhere in the instructions was there a statement that the culpable negligence of the appellants, if any, must be the proximate cause of the fatal collision.
If this be the appellants' criticism of the instructions, the answer is that instructions S-1 (as to Fader), and S-3 (as to Cowan), and appellants' own instructions (D-10 as to Cowan) and (D-29 as to Fader), inform the jury in very clear and positive terms that the evidence must show beyond a reasonable doubt that the fatal collision was the direct result of the culpable negligence of the defendants before a verdict of guilty could be returned against them, and that their culpable negligence must have been the proximate cause of the death of Partee DePriest.
This Court has repeatedly held that instructions must be read and considered as a whole and that when the jury is properly instructed considering all the instructions there is no error. Hutchinson v. State, 391 So.2d 637 (Miss. 1980).
The instructions, when read together, correctly stated the applicable law and this assignment of error is without merit.

V. and VI.
The joint indictment charged that Paul Carey, Cary Cowan and Don Fader

*1351 "did unlawfully, wilfully & feloniously, kill and slay one WILLIAM HUNTER PARTEE DePRIEST, a human being, by culpable negligence, without authority of law by the negligent operation of an automobile, contrary to the form of the statute in such cases made and provided, and against the peace and dignity of the State of Mississippi, in violation of Section 97-3-29, Mississippi Code, 1972, As Amended."
The appellants were arraigned on November 26, 1979, whereupon they entered their pleas of "not guilty". On December 4, 1979, appellants demurred to the indictment. On the same date, the state moved to amend the indictment by substituting § 97-3-47 for § 97-3-29. The state's motion was granted and on December 14, 1979, the appellants' demurrer to the indictment was overruled.
In Dendy v. State, 224 Miss. 208, 79 So.2d 827 (1955), there was a similar indictment for manslaughter by culpable negligence. In Dendy, this Court said:
"[W]e think that the reference to the code section in the indictment was surplusage and unnecessary to the charge of the crime for which appellant was tried. .. . Here the offense was `certainly and substantially described.' Code, § 2454 [§ 99-7-37 MCA (1972)] provides, `it shall be sufficient, in an indictment for manslaughter, to charge that the defendant did feloniously kill and slay the deceased, concluding in all cases as required by the Constitution.' Manifestly there was a clerical mistake in the citation appearing in the indictment prior to its amendment. These statutes were intended to apply to a situation of this type. Appellant had ample and sufficient notice of the offense with which he was charged... ." 224 Miss. at 213, 79 So.2d at 829.
Other late cases in which we have declared the citation of a statute in an indictment as surplusage are Moore v. State, 264 So.2d 414 (Miss. 1972); Alston v. State, 258 So.2d 436 (Miss. 1972); and Westmoreland v. State, 246 So.2d 487 (Miss. 1971).
There is no merit in assignments of error V. and VI.
For the reasons stated, the conviction and sentence of Cary Cowan and the conviction and sentence of Don Fader are affirmed.
AFFIRMED.
PATTERSON, C.J., SMITH, P.J., and SUGG, WALKER, BROOM, LEE, BOWLING and HAWKINS, JJ., concur.